NUMBER 13-07-00136-CR


 

COURT OF APPEALS


 

THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


JUSTIN MARTINEZ, Appellant,


v.


THE STATE OF TEXAS, Appellee.

 


On appeal from the 214th District Court of Nueces County, Texas.


 


MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Yañez and Benavides


Memorandum Opinion by Justice Benavides



 Justin Martinez, the appellant, was charged by a grand jury with burglary of a
habitation with the intent to commit theft. See Tex. Penal Code Ann. § 30.02 (Vernon
2003). The indictment included a repeat felony offender enhancement. See id. § 12.42
(Vernon Supp. 2008). On February 6, 2007, a jury found him guilty of burglary of a
habitation. See id. § 30.02. The jury assessed punishment of seventeen years in prison. 
The trial court denied Justin's motion for new trial. (1) Justin raises two issues on appeal: 
(1) whether the evidence was factually sufficient to support the conviction; and (2) whether
the trial court abused its discretion in denying his motion for new trial. We affirm.

I. Factual Sufficiency

 In his first issue on appeal, Justin argues that the identification testimony presented
at trial was insufficiently certain to justify the jury's verdict. The identification testimony,
placing Justin at the scene on the day in question, changed through the course of the
investigation. Justin asserts that the evidence is factually insufficient because "this type
of vacillating testimony is not reliable enough to prove the [a]ppellant guilty beyond a
reasonable doubt." We disagree. 

A. Standard of Review

 When performing a factual sufficiency review, we review all of the evidence in a
neutral light. Watson v. State, 240 S.W.3d 404, 414 (Tex. Crim. App. 2006). We must (1)
review the evidence submitted in support of the verdict to determine whether, though
legally sufficient, it is "'so weak' that the jury's verdict seems 'clearly wrong and manifestly
unjust,'" and (2) considering conflicting evidence, determine whether "the jury's verdict,
though legally sufficient, is nevertheless against the great weight and preponderance of the
evidence." Id. at 414-15 (internal citations omitted). A jury verdict is clearly wrong and
manifestly unjust when it "'shocks the conscience'" or "'clearly demonstrates bias.'" Zuniga
v. State, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004), overruled on other grounds by
Watson, 204 S.W.3d at 405, 417. To a very limited extent, we may substitute our judgment
for that of the jury on determinations of credibility and weight. Marshall v. State, 210
S.W.3d 618, 625 (Tex. Crim. App. 2006). However, we may not reverse a fact finder's
decision merely because we would have decided differently or disagree with the result. 
See Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

B. Discussion

 Miguel Canseco, the victim in this case, testified for the State. On September 4,
2006, in the late afternoon while he was away from his home, Miguel's house was broken
into, and several items belonging to him were removed, including two televisions, men's
clothing, approximately $800 in cash, and other items. 

 During the time these events occurred, Miguel was exercising his visitation rights
with his two-year-old daughter whose mother is Valerie Martinez. (2) Miguel typically would
pick his daughter up at Valerie's house and return her to the house later in the day.

 On September 4, 2006, Valerie was not at home when Miguel attempted to return
his daughter at the end of his time with her. He was finally able to meet Valerie sometime
around 5:00 p.m. that afternoon. After dropping his daughter off with Valerie, he went to
his mother's house, where he found his mother and sister visibly upset. Thirty minutes
later, he returned to his own home and found the front door kicked in and the house
ransacked. 

 Genesis Canseco, Miguel's sister, testified that on September 4, 2006, she was
living with her mother. That afternoon, upon hearing a knock, she answered the door. 
Justin Martinez was at the door. Genesis knew Justin through Valerie. He appeared mad
and wanted to see her brother, Miguel. Genesis told Justin that Miguel was not there. 
Justin seemed very upset, was yelling and gesturing, and was demanding that Genesis tell
him where to find Miguel. She saw a male passenger in the car that Justin had arrived in,
but he never got out of the car. Before he left, Justin said, "You better tell [Miguel] to stay
away from Valerie." 

 Gina Canseco, Miguel's mother, also testified. Gina said that, when Justin came
to the door of her house on September 4, 2006, "[h]e was very upset" and was threatening
Miguel. She was afraid for her son's safety. She told Miguel about Justin's actions and
threats before Miguel left her house on September 4, 2006.

 Juan David Alvarado, then Miguel's neighbor, testified he was at home cooking
supper on September 4, 2006. He heard a loud noise, looked out his kitchen window, and
saw a car backed up into the driveway by Miguel's house. He saw someone who
resembled Miguel place a television inside the car. Because these events occurred during
daylight hours, Alvarado thought it was Miguel placing the television in the car, and thought
Miguel must be moving out of the house. Later, Alvarado identified Justin from a photo
lineup as the man who he saw at Miguel's house carrying the television. Alvarado also
pointed Justin out at trial as one of the men he had seen at Miguel's house that day.

 Sergeant James Lerma, a patrolman with seven years experience with the Corpus
Christi Police Department, was dispatched to Miguel's house to "take the initial report." 
Miguel met him outside the house, and while speaking with Lerma, confirmed the dispatch
call. Lerma also spoke with Gina Canseco, Miguel's mother, who was "very upset" when
he talked with her. Lerma walked the scene, noticed that the house had been ransacked,
and "could tell [the front door] had been kicked open." Lerma also noticed that a dresser
looked as though a television had been removed from it and a cable line had been
disconnected. Lerma tried to contact some neighbors, but none were available. Lerma
"called [the] identification section to come and process the scene."

 Diego Rivera, a crime scene technician with the Corpus Christi Police Department,
responded to Lerma's call. Rivera examined the house, specifically looking for fingerprints
on the dresser and its top, a nightstand top, and the front door. Rivera was unable to find
any fingerprints. 

 Valerie Martinez testified on Justin's behalf. At one point, she was Justin's
neighbor, which explains how they met. She and Miguel had an "off-again-on-again"
relationship, and when the relationship was "off," she sometimes would date Justin. During
2006, she occasionally lived with Miguel at his house, including during the summer of
2006, but did not live there during September 2006. 

 According to Miguel, Valerie never had a key to his house, though she claimed she
did. On September 4, 2006, she asked Justin to take her to Miguel's house to pick up
some of her "stuff," items Miguel had supposedly taken from her while she was not living
with him. Justin picked her up in his mother's car, and he had a friend with him. When
they arrived at Miguel's house, according to Valerie, the front door was unlocked, so she
did not need to use her key. She noticed no damage to the door or its frame, and it was
unnecessary to break down the door to get inside. She testified that no one accidently
knocked the door off its frame. Valerie went through the closet and drawers to find her
things, and also removed two television sets her mother had purchased for her. She did
not "ransack" the house nor did she see or remove any cash. As a matter of fact, she
testified, if Miguel had any money, he would have kept it in the bank. Valerie also stated
that Miguel is a very jealous person. On cross-examination, Valerie confirmed that she had
never spoken to the police or the district attorney's office about the story she was telling
during the trial. However, Valerie had not been hiding or avoiding the police or district
attorney's office.

 There was ample testimony placing Justin at the scene of the crime. Valerie's
testimony provides an explanation for some, but not all, of the items missing from the
home. Viewing all of the evidence in a neutral light, we cannot say that the evidence is "'so
weak' that the jury's verdict seems 'clearly wrong and manifestly unjust,'" nor can we say
that "the jury's verdict, though legally sufficient, is nevertheless against the great weight
and preponderance of the evidence." See Watson, 240 S.W.3d at 414-15. We overrule
Justin's first issue.

II. Motion for New Trial

 Justin filed a motion for new trial, arguing that an unauthorized conversation
between Rivera, Officer Lerma, and two jurors occurred. Justin argues that the
conversation violated article 36.22 of the code of criminal procedure, which prohibits
conversations with jurors "about the case on trial except in the presence and by the
permission of the court." See Tex. Code Crim. Proc. Ann. art. 36.22 (Vernon 2006). The
trial court denied the motion, but decided to punish Lerma and Rivera by suspended fines. (3) 
Justin argues that the trial court committed error by denying his motion for new trial.


A. Standard of Review

 We apply the abuse of discretion standard when reviewing a trial court's decision
on a motion for new trial. Charles v. State, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). 
Without substituting our judgment for the trial court's, we must determine whether the trial
court's decision was unreasonable or arbitrary. Id. at 208. We (1) view the evidence in the
light most favorable to the ruling, and (2) "presume that all reasonable factual findings that
could have been made against the losing party were made against that losing party." Id.
at 208. We "must defer to any reasonable implied factual findings that the trial court might
have made in denying a motion for new trial." Id. at 211. "The trial court is the sole judge
of the credibility of the testifying jurors. Where there is conflicting evidence on an issue of
fact as to jury misconduct, the trial judge determines the issue and there is no abuse of
discretion in overruling the motion for new trial." Salazar v. State, 38 S.W.3d 141, 148
(Tex. Crim. App. 2001). 

 An unauthorized conversation about the case between a juror and another person
gives rise to a presumption of injury to the defendant and a new trial may be in order. 
Quinn v. State, 958 S.W.2d 395, 401 (Tex. Crim. App. 1997). However, the State may
rebut the presumption of harm. Id. A new trial will not be warranted unless there has been
injury to the defendant. Thomas v. State, 699 S.W.2d 845, 853 (Tex. Crim. App. 1985). 
"Examples of methods of proving there has been no injury include a showing by the State
that the case was not discussed or a showing that nothing prejudicial to the accused was
said." Id. We will find that a trial court has abused its discretion in denying a motion for
new trial "only when no reasonable view of the record could support the trial court's ruling." 
Id. at 208.

B. Discussion 

 During a post-trial hearing, Diana Amesquita, a juror in the case, explained that
during the guilt or innocence phase, she and another juror were riding in the elevator with
Lerma and Rivera following their testimony. Rivera allegedly said to them, "Ladies, did I
dazzle you?" The two jurors responded that they were not allowed to discuss anything. 
Lerma then said, "Ah, so they invoked the rule." Then, the jurors reiterated that they were
not able to discuss anything, and, according to Amesquita, Lerma replied, "It's weird that
at the grand jury you can discuss almost anything."

 Amesquita was the only juror to testify at the post-trial hearing. She said she
thought that Rivera was merely flirting with her and the other juror in the elevator, who was
also a female. She confirmed that none of the comments or conversations influenced her
in reaching a decision regarding Justin's guilt or innocence or during the sentencing phase. 
She did not give greater weight to the State's evidence or to Justin's evidence as a result
of Rivera's comment. She did not consider Lerma's comments to imply that there was
additional information about the case that he was not allowed to raise in his testimony. 
Amesquita and the other juror did not discuss these comments between themselves nor
with other jurors. Amesquita did not know whether the comments had an effect on the
other juror's decisions at either phase of the trial.

 Without substituting our judgment for the trial court's, viewing the evidence in the
light most favorable to the ruling, and "presum[ing] that all reasonable factual findings that
could have been made against the losing party were made against that losing party," we
hold that the trial court did not abuse its discretion in overruling Justin's motion for new trial. 
See Charles, 146 S.W.3d at 208. Here, the trial court determined, as the sole judge of
Amesquita's credibility, that no misconduct had occurred. See Salazar, 38 S.W.3d at 148. 
The State successfully rebutted the presumption of injury to Justin by demonstrating that
nothing prejudicial to him was discussed. See Thomas, 699 S.W.2d at 853. The trial court
impliedly found, by denying the motion for new trial, that no injury to Justin occurred, even
though the trial court decided to punish Lerma and Rivera, and we must defer to the
implied finding. See Charles, 146 S.W.3d at 211. We cannot find that "no reasonable view
of the record could support the trial court's ruling," id. at 208; therefore, we overrule Justin's
second issue.

III. Conclusion

 Having overruled both of Justin's issues on appeal, we affirm the trial court's
judgment. 


 __________________________

 GINA M. BENAVIDES,

 Justice


Do not publish.

See Tex. R. App. P. 47.2(b)


Memorandum Opinion delivered and 

filed this the 26th day of February, 2009.

 

1. In this case, there are three Cansecos and two Martinezes; we will refer to each person by his or
her first name to avoid confusion.
2. Valerie Martinez and Justin Martinez are not related to each other by blood or by marriage. They
do, however, have two other children together.
3. See Tex. Code Crim. Proc. Ann. art. 36.22 (Vernon 2006) (providing the punishments that are
available for violating article 36.22).